**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **U.S. Equal Employment Opportunity** | ) | **CASE NO. 1:09 CV 2119** |
| **Commission,** | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Dave's Supermarkets, Inc.,** | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Defendant.** | ) | |

<u>**Introduction**</u>

This matter is before the Court upon defendant's Motion for Summary Judgment (Doc. 14).  This case alleges sexual harassment.  For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

<u>**Facts**</u>

Plaintiff, U.S. Equal Employment Opportunity Commission (hereafter, plaintiff or EEOC), filed this Complaint against defendant, Dave's Supermarkets, Inc., alleging that defendant maintained a sexually hostile environment.  The EEOC is the agency responsible for, *inter alia*, enforcing Title VII.  The Complaint alleges that since at least May 28, 2008,

1

employee Regina Billups was subjected to unwanted sexually explicit comments and sexual behavior from defendant's meat department manager, Jugo Vidic.  Although Billups reported the conduct to defendant's owner and members of its management team, defendant failed to take prompt and effective corrective action. Vidic's pattern of sexual harassment culminated in Billups's constructive discharge. Vidic engaged in similar patterns of sexual harassment against other of defendant's female employees (consisting of a class of females similarly situated to Billups), which led to their constructive discharge.  The Complaint seeks, *inter alia,* punitive damages.

Dave's Supermarkets, Inc. (hereafter, Dave's) is a family-owned grocery store chain in Northeast Ohio, operating 14 locations.  (Norman Szylakowski aff.) Dave's is owned and operated by Burton Saltzman and his sons.  (Saltzman depo)  Dave's began operating the Harvard Lee store in 2007.  (Porter depo.) All the allegations giving rise to the claims herein occurred at this location.

Jugo Vidic is a trained meat-cutter who was employed by Dave's as the manager of the meat department at the Harvard Lee store at the time of the alleged events giving rise to this lawsuit.  (Norman Szylakowski aff.)  Vidic began his employment for Dave's around 2000.[1]  (Vidic depo.)  Norman Szylakowski began working for Dave's in 2007 as the Human Resources Manager which title was later changed to Human Resources Director.  He is responsible for human resources functions at all 14 stores, including investigating sexual harassment claims.  (Szylakowski depo.)

---

[1]     The EEOC states in its brief that he was transferred to the Harvard Lee store in 2007, but the deposition testimony upon which it relies has not been filed.

2

Beginning in 2007, Salvatore Albanese was the store manager at the Harvard Lee store until he was transferred to another store and Frank Radka (or Ratka) became the store manager at the Harvard Lee location. (Albanese depo.;Szylakowski depo.)  Beginning in mid-2007, Booker Thomas was the co-manager of the Harvard Lee store and he reported to Albanese until Radka became the manager early in 2010.  (Thomas depo.)

The following are women whose allegations form the basis of the lawsuit brought by the EEOC.[2]

**Regina Billups**

Regina Billups completed an application for employment with Dave's and was interviewed at the Harvard Lee store on May 28, 2008, by assistant manager Booker Thomas for a position in the meat department.  On that date, Thomas introduced Billups to Vidic who gave her a tour of the meat department.  According to Billups, "the first thing out of [Vidic's] mouth was, 'Do you have a boyfriend?' " This did not bother Billups "because at the time I really didn't have a boyfriend."  Vidic also complimented Billups on how she looked, said that she smelled good, and kissed her hand upon meeting her. Billups's initial reaction was

---

[2]     The Court has addressed the women in the order presented by defendant. For clarity purposes, the dates of employment at the Harvard Lee store are as follows:

| | |
|---|---|
| Regina Billups | May 28, 2008 (interview)- November 1, 2008 |
| Danielle Yates | November 2008- January 2009 |
| Iola Foy | May 2008 (five days) |
| Lacey Napier | January 2007- October 2008 |
| Tenisha Woods | February 2010 - |

3

that Vidic was a nice man, overly friendly, but she did not think anything of it.  Vidic

caressed the palm of her hand in leading her around the department.  Billups snatched her

hand away and told Vidic that he was being overly friendly.  When Billups briefly met with

Thomas again before leaving the store, she indicated that Vidic was overly friendly but did

not indicate that he offended her.  (Billups depo.)

  Billups was hired for the position in the meat department, returning to the store for her

first day of employment on June 1.  Vidic was there and introduced her to co-workers.  Then

"the jokes started."  After Billups inquired about bringing coffee into the department, Vidic

said that he liked his coffee black.  When asked at deposition whether this comment offended

her, Billups stated, "No.  Some people like black women.  It doesn't bother me at all." John

Harmon, who was in charge of the meat department in Vidic's absence, interjected and Vidic

said not to pay attention to him because although he was bigger than Vidic, "he's small in

size."  Vidic also said, "I like it hot and moist." The comments "went over her head," and

Billups was not offended by them.  On that day, Vidic showed Billups the meat department

freezer and put his hand on the small of her back, letting it slip down to her buttocks.  At first

Billups moved out of the way, but when he did it a second time, she moved his hand away.

(*Id*.)

  At the end of her first day of work, Billups attempted to find store manager Albanese

and co-manager Booker, but they were not in the store.  She went home and contacted her

landlord, Sam Woodie, who had previously worked as a meat cutter for Dave's and knew

people in Dave's management.  The next morning, June 2, 2008, Billups and Woodie called

Burt Saltzman, the owner of Dave's, and told him about what had happened the previous day.

4

At first Saltzman laughed.  (*Id.*) Woodie also testified that Saltzman laughed at first and said, "Oh, no, Jugo is one of my best employees.  He wouldn't do something like that."  (Woodie depo.) After Billups started crying, Saltzman told her to contact Norm Szylakowski, Dave's Human Resources Manager.  Saltzman also told Billups not to talk to anyone about it when she returned to the store. Billups contacted Szylakowski.  When Billups arrived at the store the next day, two female department managers told her that Vidic had sexually harassed other workers.  Other employees approached Billups to "say something" about Vidic. John Harmon and Perry McCormick told Billups that Vidic had "bother[ed] other folk." (Billups depo.)

According to Szylakowski, he went to the store within one and one-half hours after Billups called him.  He met with Billups, along with Sal Albanese, the store manager. Szylakowski and Albanese interviewed Billups and asked her to write a statement. Billups did prepare a written statement, dated June 1, 2008.  During the interview, Billups identified two witnesses. Szylakowski and Albanese asked these two employees to make a written statement, but they declined because they said they had only heard what Billups had told them and had not seen anything.  Vidic was also interviewed at that time.  (Szylakowski depo.; Doc. 14 Ex. E)

A report was prepared by Szylakowski, dated June 2, 2008, stating:

Today Sal Albanese and I conducted an investigation into the allegations of sexual harassment made against Yugo [Jugo] Vidic by Regian [sic] Billups.  When she called me today I went out to the store within an hour and a half.

We interviewed Regina, and two employees she said would corroborate her statements, Perry McCormick and Beatrice Williams.

We asked them to write statements but they had not been witnesses to any acts of sexual harassment.

5

>We interviewed Jugo and counseled him to be careful of any words or actions that could be misconstrued as sexual harassment.   He denied any wrong doing.
>
>After our interviews, we offered to transfer Regina Billups to the Deli at the same rate of pay and amount of hours if she felt uncomfortable working in the meat department. She chooses to remain in the meat department.
>
>Since there were no witnesses to any acts of sexual harassment, our investigation is inconclusive at this point.

(Doc. 14 Ex. D)

Vidic testified that he has never been given a written or verbal warning concerning sexual harassment, and that no one has ever met with him to inform him that sexual harassment is not tolerated at Dave's.  (Vidic. depo. 126-127)

According to Billups, she declined to transfer to a different department because the manager of the other department told Billups that she would not get the same number of hours as she was working in the meat department given that an employee had just been hired. Additionally, other meat department employees liked Billups and asked her to stay.  (Billups depo.)

Billups did not make any further written reports of sexual harassment by Vidic.  She testified that between June 1 and November 2008, Vidic never touched her again.  After June, however, Vidic was "nasty and rude" to her, and ridiculed or embarrassed her in front of customers.  More than three times, Billups heard Vidic call her a bitch, whore, or slut.[3] Billups terminated her employment with Dave's on November 1, 2008 because she "was fed up" with Vidic.  The EEOC Enforcement Investigator, Maria Colon, advised Billups to keep a

---

[3]     In an interview with the EEOC, Billups stated that she never actually heard Vidic call her these names.  (Doc. 45 Ex. A)

6

notebook and write down whether she was being bothered, but Billups did not record any further acts of harassment. (Billups depo.)  Booker Thomas testified that he knew Billups was fed up with Vidic making verbal comments to her.  (Thomas depo.)

Booker Thomas, the store's co-manager, testified that Billups complained to him about Vidic.  Thomas stated that Billups told him that Vidic "touched her on her back side." Thomas told Billups, "Are you sure?  I will talk to him.  That is not appropriate.  That's not allowed if that's the case and follow through on that."  Thomas then questioned Vidic who said that he did not do it intentionally.  Thomas also testified that because Billups stated numerous times that Vidic "was harassing her, not sexually, but verbally," he and Albanese talked with Vidic.  (Thomas depo.)

Darlene Nichols, the seafood manager, testified that Billups came to her on about five different occasions to complain about Vidic's sexually inappropriate conduct.  Billups was crying and asking for help, but Nichols had other issues and did not want to get involved. Nichols advised Billups to "take it to somebody else.  Call the union, do whatever you got to, but I can't get involved because I already have issues."  The "issues" Nichols was referring to was the fact that she had reported seeing Vidic possibly taking food and not paying for it. This caused Vidic to confront her and Albanese to call her at home to tell her to "leave it alone." (Nichols depo.)

Szylakowski testified that Billups did not give a reason as to why she terminated her employment.  (Szylakowski depo.)

**Danielle Yates**

Yates worked for Dave's as a meat wrapper from November 2008 through January

2009.  During her first meeting with Vidic, he looked her up and down, and was flirty.  On

her first day of work, she apologized for being late and Vidic said, "You're never late in my

eyes."  Vidic "looked her up and down," and Yates told him, "You need to move."  After that,

Vidic "mentally harassed" her, criticized her work, and blamed her for things that she could

not have done.  One day, after arguing with Vidic, Yates told co-manager Booker Thomas

that she was tired of Vidic "messing" with her.  Yates testified that Sal Albanese told her that

he heard Vidic was harassing her, and Albanese told Yates he would transfer her to the deli

department.  But, Yates was never transferred. She terminated her employment in January

2009.  In an EEOC interview, Yates stated that Vidic "wasn't sexually harassing me.  He just

gave me a hard time about everything and I got tired of it and quit." The EEOC statement

further states, "Yates never experienced or witnessed any sexual harassment by anyone.  Her

only complaint was that Jugo 'nitpicked' her work, but he was known to do that to all new

hires."[4]  (Yates depo.; Doc. 14 Ex. 6)

### Iola Foy

Iola Foy testified that she filled out an application for employment in the meat

department at Dave's in May 2008.  On that date, she met Vidic who asked her if she would

be willing to work a few days a week, and she told him, "Yes."  Vidic also asked Foy if she

had a boyfriend.  She responded that she did not.  Vidic said he would talk to his hiring

manager and that Foy should return the next day.  As she and Vidic walked down the grocery

---

[4]      Sal Albanese testified that Vidic was "a very demanding meat manager" whose
standards are "very high,"and that he pushes his employees to do better.
(Albanese depo. 44)

aisle to exit, Vidic "turned around and he was grabbing his penis and he asked me, 'Is it big?' and asked me, did I want to touch it and I proceeded to say, 'No.' " Foy thought it was awkward, but that "him being so bold with it, I just really left it alone."  Foy returned the next day and was hired.  On that day, as Vidic and Foy were on the stairwell going up to the break room, Vidic "pulled out his penis this time and he asked me, 'Is it big enough?' and he was just fondling himself."  Foy told him that she was not interested in him like that.  Foy figured that because he was so bold there and in the aisle the previous day, "I really thought nobody would believe me... so I just basically left it alone."  Vidic also approached Foy in the meat freezer and told her they could "keep this under cover," and "we could go to a hotel and keep this under cover." Vidic told her that he would pay for the hotel room.  Foy worked the remaining days that she had been scheduled, about five, and then terminated her employment.

Foy testified:

> [I] worked all those days he scheduled me.  I requested that I didn't want to work with him.  I said, 'I will come in the afternoon' and he would not schedule me.  He always scheduled me with him, so I just figured, Okay, he's going to continue on doing this so I don't want to continue working here.  After the two-week mark, I talked to Angie.  She was the head cashier manager.  I was calling about my-- well, it would have been my last check and I was going to tell her why I left and she proceeded asking me why I left and I told her about the situation, what happened.
>
> She said why didn't I come to her and tell her and I said because I was -- first of all, I was emotionally in disbelief with it.  I was upset.  I was depressed.  I was set back and I didn't think nobody would believe me because he was so bold with it and she told me, 'Well, we don't play that here and I'm going to take down your information' and basically that was the end of the conversation and I didn't hear of anything else until almost-- I think a year later from Maria Colon[5], so.

(Iola Foy depo.)

---

[5]     Colon is an Enforcement Investigator for the EEOC.

9

**Lacey Napier**

Lacey Napier began working for Dave's in January 2007 in the deli department at the Harvard Lee store.  She testified that beginning in June or July 2007 on a daily basis, Vidic would walk through the deli area and pull on her apron strings which tied in the back.  Others saw Vidic doing this, including the deli manager. On one occasion, Vidic groped her from behind.  Napier told Vidic to stop.  She also told her deli manager, Debby Farrar, but nothing changed.  Around October 2007, Napier told Sal Albanese.  Albanese told Napier to keep it in the deli department.  Napier interpreted this to mean that she should tell her department manager rather than telling him.  After she reported it to Albanese, Vidic continued to pull on Napier's apron strings on a daily basis.  A couple weeks after reporting Vidic to Albanese, Napier asked her deli manager to again tell Albanese what was going on.  On another occasion, Vidic asked Napier if she was still with her boyfriend and stated, "I bet his thing is not bigger than mine.  Referring to his penis, his private part." In June or July 2008, Vidic pulled Napier to him, thrusting his hips into her backside.  Napier reported Vidic's conduct to Albanese a second time and asked whether he could keep Vidic out of the deli department.  Albanese indicated that he could not keep Vidic out of the department, but that he would talk to him.[6] After that, nothing changed.  Napier left her employment with Dave's in October 2008 after finding another job.  She cited conflict with another deli employee and the situation with Vidic as the reasons for her departure.  (Napier depo.)

Darlene Nichols, the seafood manager, saw Vidic "come over and he would play with

---

[6]     The Court can assume that when Napier reported Vidic's conduct to Albanese in June or July 2008, defendant had notice of Regina Billups's June 1, 2008 complaint.

[Napier.] She seemed to like it though.  I didn't see her upset."  When asked what she saw

Vidic doing, Nichols stated, "Kind of getting real close to her."  Nichols called her

supervisor, Vince McDonough, and told him that Vidic was behaving inappropriately and that

"he is over messing with one of the deli girls."  McDonough told Nichols "that's

unacceptable" and he would talk to Vidic.  Nichols also recalled that Sal Albanese found out

about this report and said to her, "[D]on't you know [Vidic and McDonough] are best

friends?"  (Nichols depo.)

**Tenisha Woods**

Tenisha Woods became employed with Dave's in January 2007 in the Payne Avenue

store.  She worked first in hot foods, then was transferred to the meat department around

August 2007 where she worked for about a year and a half before being transferred to the

meat department in the Lee Harvard store in around February 2010. Vidic asked Woods if she

had a boyfriend.  On one occasion, Vidic called Woods into the meat department office and

said that she was having intercourse with one of her co-workers.  Woods responded, "What

are you talking about?"  Vidic also grabbed her breast and said, "I know you want to f— me,

we are friends.  I know you want to f— me."  Woods told Vidic never to touch her and

walked away.  The next morning, Woods reported the incident to John Harmon, the assistant

meat department manager, and Frank Radka, the store manager.  She also told a member of

the human resources office.  Woods wrote a statement.  (Woods depo.)[7]

According to Szylakowski, management at the Harvard Lee store notified him of

Woods's report which occurred on August 2, 2010.  An investigation was launched and "[i]n

---

[7]        She also filed a police report.

light of the instant litigation, Dave's suspended Mr. Vidic pending completion of the

investigation."  Szylakowski avers that unlike the other allegations involved in this lawsuit,

"there was partial corroboration of the female employee's allegations in that Mr. Vidic

admitted that he had questioned Ms. Woods about rumors of her having sex at the Harvard

Lee store with a co-worker."  Szylakowski further avers, "Because of the poor judgment

exercised by Mr. Vidic in questioning Ms. Woods in the meat department office about the

rumors, Dave's terminated Mr. Vidic's employment on August 6, 2010."  (Szylakowski aff.)

This matter is now before the Court upon defendant's Motion for Summary Judgment.

## **Standard of Review**[8]

Summary Judgment is appropriate when no genuine issues of material fact exist and

the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*,

8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine

issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with affidavits," if any, which it believes demonstrates
> the absence of a genuine issue of material fact.

---

[8]     Rule 56 has been amended, effective December 1, 2010. The substantive standard
for summary judgment remains unchanged. *See* Fed.R.Civ.P. 56 advisory
committee's note. At any rate, the version of the rule that was previously in effect
controls here as the Motion for Summary Judgment was filed on November 15,
2010.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial.  If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the

13

legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

The elements of the prima facie case of hostile work environment based on sexual harassment are well-established and which require a plaintiff to show by a preponderance of the evidence that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) there is a basis for employer liability.  *Thornton v. Federal Express Corp.*, 530 F.3d 451 (6th Cir. 2008) (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir.1999)).

The standard for the employer liability element of the prima facie case depends on whether the alleged harasser is the plaintiff's supervisor or a co-worker. This case involves the former as Vidic was a department manager.[9] The Sixth Circuit in *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263 (6th Cir. 2009) (quoting *Petrosino v. Bell Atlantic*, 385 F.3d 210 (2d Cir. 2004)) stated:

> Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior 'culminate[d] in a tangible employment action' against the employee, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257, 141 L.Ed.2d 633; if it did, 'the employer will, *ipso facto*, be vicariously liable,' *Mack v. Otis Elevator Co.*, 326 F.3d [116] at 124 [(2d Cir.2003)]. In the absence of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors

---

[9]     Although the Complaint cites language relevant to co-worker harassment, Compl. ¶ 7(g), it is undisputed that Vidic was the meat department manager and, therefore, a supervisor.  Whether or not plaintiff plead supervisory harassment is not dispositive to the standard of employer liability that this Court must apply based on the perpetrator's status, i.e., co-worker or supervisor.

unless it successfully establishes as an affirmative defense that (a) it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' and (b) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.' *Burlington Indus., Inc. v. Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257, 141 L.Ed.2d 633; accord *Faragher v. City of Boca Raton*, 524 U.S. at 807, 118 S.Ct. 2275, 141 L.Ed.2d 662; *Mack v. Otis Elevator Co.*, 326 F.3d at 125.

*See also Harris v. Sodders*, 2009 WL 331633 (6th Cir. February 11, 2009) ("If the alleged sexual harassment was committed by a supervisor, an employer is liable if a tangible employment action is taken against the employee. If no tangible employment action was taken against the employee, the employer has an affirmative defense available to avoid liability.

*Faragher v. City of Boca Raton,* 524 U.S. 775, 780, 807 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 758-59 (1998).")

Plaintiff seeks punitive damages. The Sixth Circuit has recognized,

Title VII limits recovery of punitive damages to cases where 'the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.' 42 U.S.C. § 1981a(b)(1). *Kolstad v. American Dental Association*, 527 U.S. 526, 539, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), establishes a three-part inquiry governing the recovery of punitive damages against an employer. First, the plaintiff must demonstrate that the individuals perpetrating the discrimination acted with malice or reckless disregard toward the plaintiff's federally protected rights. Second, the plaintiff must impute liability to the employer by establishing that the discriminatory actor worked in a managerial capacity and acted within the scope of his or her employment. Third, the defendant may nevertheless avoid punitive damage liability by showing that it engaged in good faith efforts to comply with Title VII. *See Parker v. Gen. Extrusions, Inc*., 491 F.3d 596, 602-03 (6th Cir.2007).

*Fischer v. United Parcel Service, Inc.*, 390 Fed.Appx. 465 (6th Cir. 2010) (addressing punitive damages in a retaliation claim based upon race discrimination).

To determine whether an employer engaged in good faith efforts to comply with Title VII, the Court must focus on whether the employer had a written anti-discrimination policy

and whether the employer effectively publicized and enforced its policy.  *Id.*  (citations omitted).  The  "the mere existence of a written anti-discrimination policy alone does not shield the company from punitive damages." *Id.*  Instead, the defendant "must demonstrate that it engaged in good faith efforts to implement the policy." *Id.* (citations omitted).

In its motion, defendant makes two arguments.  First, it asserts that the fourth element of the prima facie case cannot be satisfied because none of the women were subjected to a hostile work environment by Vidic.  Second, defendant asserts that the EEOC is not entitled to punitive damages.

Defendant does not move for summary judgment on the basis of the *Ellerth/Farragher* affirmative defense discussed above, i.e., that defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and the women unreasonably failed to take advantage of any preventive or corrective opportunities provided by defendant.  Therefore, this Court will only address whether there existed a hostile work environment, and the issue of punitive damages.

**(A) whether there existed a hostile work environment**

This Court evaluates the conduct at issue by both an objective and subjective standard.  This Court considers whether (1) a reasonable person would find the environment objectively hostile, and (2) the plaintiff subjectively found the conduct severe or pervasive.[10]  *Gallager v. C.H. Robinson Worldwide*, 567 F.3d 263 (6th Cir. 2009) (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17 (1993) ).  In so doing, the Court must take into account the totality of the

---

[10]     The United States Supreme Court in *Harris, supra,* made clear that the standard is severe *or* pervasive.

circumstances. *Id.* "[E]ven where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." *Id.* A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993).  "Summary judgment is appropriate only if the evidence is so one-sided that there is no genuine issue of material fact as to whether there was a hostile work environment."  *Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321 (6th Cir. 2008) (citations omitted).

### (1) Billups

Defendant asserts that Billups did not subjectively perceive Vidic's behavior to be offensive given her testimony that she considered him to be merely overly friendly, the jokes went over her head, and she was not offended by his comments or the first time he touched her.  For the following reasons, the Court disagrees.

Construing Billups's testimony most favorably to plaintiff, it is clear that these were Billups's initial reactions to Vidic's conduct.  Billups wrote a statement complaining about Vidic's conduct which was dated June 1, 2008- her first day of employment.  This would seem to show that she found his actions offensive. Her testimony also shows that at the end of her first day, Billups contacted her landlord, Sam Woodie, about the situation.  She and Woodie contacted Burt Saltzman the following morning to report what had happened the first day.  Billups also called Szylakowski to report Vidic which prompted his investigation on June 2 "into the allegations of sexual harassment" made by Billups concerning Vidic.

17

Billups's testimony also appears to show that at the end of her first day of employment, she attempted to report Vidic's conduct to the store manager and co-manager:

> Q.  So we've covered everything that happened on June 1?
>
> A.  Yeah, because he left, Jugo left and I went and Sal [Albanese] was gone.  Booker [Thomas] wouldn't be back until Tuesday.  I found that out because I went up front. I'm going to say it was Regina Baker that told me that he was not going to be there until Tuesday**. ...**

(Billups depo. 64-65) Moreover, as discussed above, the evidence shows that Billups complained to Booker Thomas about Vidic touching her, and the seafood manager testified that Billups came to her on numerous occasions crying and asking for help.

Defendant also argues that Vidic did not subject Billups to an objectively hostile work environment because Vidic allegedly only made a few offensive comments and touched her on the buttocks twice. Again, the Court disagrees.

Billups testified that after she reported Vidic the morning after her first day of work he called her a "bitch," "whore," or "slut" more than three times, he was nasty and rude to her, and he ridiculed and embarrassed her in front of customers.  She terminated her employment with Dave's on November 1, 2008 because she was "fed up" with Vidic.  Considering the totality of the circumstances, and the fact that the events of the first day of Billups's employment show sex-based abuse, there is an issue of fact as to whether the workplace was permeated with ridicule and insult based on Billups's sex. While defendant points out that Billups told the EEOC during an interview that she did not actually hear Vidic call her names, and that she never recorded or reported further harassment, this merely creates a question for a factfinder.

For these reasons, there is an issue of fact as to whether Billups suffered a hostile

work environment.

**(2) Yates**

Defendant contends that because Yates admitted that Vidic did not sexually harass her, summary judgment is warranted regarding her claim.  Plaintiff asserts that whether Yates believed that Vidic's conduct was not sexual harassment is not dispositive, and that the Court should draw all inferences in the EEOC's favor and conclude that Yates's rejection of Vidic's sexual advance resulted in his harassment of her.  For the following reasons, the Court agrees with defendant.

The Court has been directed to no evidence establishing that Yates endured a hostile work environment based on her sex.  Rather, the evidence shows that Vidic gave Yates "a hard time about everything," and he "nitpicked" her work.  The Court is not compelled to draw any further inferences from Yates's first contact with Vidic when she told him, "you need to move," in response to his "looking her up and down."

For these reasons, plaintiff has not demonstrated that Yates suffered a hostile work environment.

**(3) Foy**

Defendant argues that Vidic's exposure to Foy is insufficient under Sixth Circuit law to rise to the level of sexual harassment.  Defendant points to *Gwen v. Regional Transit Authority*, 7 Fed. Appx. 496 (6th Cir. 2001).  There, the court found two instances of exposure by a co-worker to be insufficient to create a hostile work environment.  Plaintiff was operating her bus when the co-worker, who was off duty at the time, drove up beside the bus as plaintiff was stopped at a bus stop. He honked his horn, and when plaintiff looked down at

him, he exposed himself to her. Plaintiff continued on her bus route. At the end of the line, the

co-worker boarded the bus, again exposed himself to her, and approached her while making

rude and inappropriate comments. The court reasoned that the conduct was not as severe as

that in *Fleenor v. Hewitt Soap Co.,* 81 F.3d 48 (6th Cir. 1996), where "we affirmed the district

court's finding of no hostile environment where the co-worker 'exposed his genitals to

plaintiff, threatened to force plaintiff to engage in oral sex with him, and 'stuck a ruler up

plaintiff's buttocks' against plaintiff's will....'"

    The conduct in *Gwen* and *Fleenor* was perpetrated by a co-worker and not a

supervisor, as is the case herein.  The *Gwen* court also found it significant that plaintiff was

unable to establish the fifth element of her prima facie case as the employer took prompt

remedial action in response to her complaint.   *Fleenor* similarly relied on plaintiff's inability

to show employer liability given that the employer promptly reprimanded the wrongdoer and

the sexual conduct stopped.

    Here, this Court cannot say as a matter of law that Vidic's actions in grabbing his

penis, asking whether it was big and if Foy wanted to touch it, and subsequently exposing and

fondling himself on the stairwell, is insufficient as a matter of law to amount to severe

harassment.  Additionally, Vidic, as Foy's supervisor, approached her in the meat freezer and

suggested that they could go to a hotel room at his expense.  There is also an issue of fact as

to the pervasive nature of the harassment given Foy's testimony that she worked for only five

days and quit after realizing that Vidic would not honor her request to be scheduled when

Vidic was not working.

    For these reasons, there is an issue of fact as to whether Foy suffered a hostile work

environment.

### (4) Napier

Defendant argues that Vidic's conduct was not so severe or pervasive to create a hostile work environment because it only consisted of one comment regarding the size of his penis, one instance of his thrusting his hips into Napier from behind, and repeated pulling on her apron strings.

The Court cannot agree that Vidic's conduct was neither severe nor pervasive so as to preclude an issue of fact.  Napier's testimony is that for more than one year Vidic, who was not her direct supervisor but one with managerial authority, touched her on a daily basis:

> At first he used to come over there [in the deli] when you wanted the hot foods manager to cook him some food. He would like walk past and pull my apron strings because we had to wear aprons. It was a couple of times when I was down in hot foods working, and he would pull my apron strings and pull me to him.
>
> And then one time it was early in the morning, I was opening by myself, I was in the deli
> cooler putting up an order of salads because they didn't put it up the previous night. I was bending over picking up a box. He came behind me and groped me. That was pretty much it.
>
> On the daily basis when he came past, he came past every day, he would pull my apron
> strings or pull me like close to him and that was on a daily basis.

(Napier depo. 19-20) Napier also testified that Vidic pulled her from behind into him at least once.  (*Id.* 22, 35-47)

Defendant asserts that the case of *Bowman v. Shawnee State University*, 220 F.3d 456 (6th Cir. 2000), compels summary judgment in its favor as to Napier because Vidic's frequent pulling on her apron strings is not severe, and pressing up to her from behind on one occasion

21

is insufficient to support a claim for sexual harassment.  *Bowman*, however, concluded that while plaintiff "recite[ed] a litany of perceived slights and abuses, many of the alleged harassing acts cannot be considered in the hostile environment analysis because [plaintiff] has not shown that the alleged harassment was based upon his status as a male."  By contrast, the evidence shows that Vidic's actions were based on Napier's female sex. The fact that Vidic asked Napier whether she still had a boyfriend and referred to the size of his penis shows that Vidic's conduct was sexual in nature.

Finally,

> To determine whether sexual harassment created a hostile work environment, the court must consider all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance.

*Hensman v. City of Riverview*, 316 Fed.Appx. 412 (6th Cir. 2009) (citing *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008) (internal quotation marks omitted).  A factfinder could conclude that Vidic's conduct was frequent based on Napier's testimony that it occurred daily, was physically threatening or certainly humiliating, and interfered with her work.

For these reasons, there is an issue of fact as to whether Napier suffered a hostile work environment.

**(5) Woods**

Defendant asserts that Woods's claim, involving a single, isolated incident in which Vidic made inappropriate comments to her, accused her of having sexual intercourse with a co-worker, and touched her on her breast over her clothing, does not constitute sexual

22

harassment as it is not sufficiently severe or pervasive. This Court disagrees.

Isolated incidents, unless extremely serious, do not amount to a hostile work environment. *Faragher*, 524 U.S. at 788. The Court finds an issue of fact as to whether Vidic calling Woods into the office, accusing her of having sex with a co-worker, suggesting that she could have sex with Vidic, and grabbing her breast while saying, " I know you want to f- me," is extremely serious. For a supervisor to deliberately touch an employee's breast is overtly sexual conduct. Other courts have found instances of uninvited physical contact with intimate parts of the body to be among the most severe types of sexual harassment. *Berry v. Chicago Transit Authority*, 618 F.3d 688 (7th Cir. 2010) (citations omitted) (recognizing that a single act can create a hostile work environment if severe enough).

For these reasons, there is an issue of fact as to whether Woods suffered a hostile work environment.

Accordingly, the Court finds an issue of fact as to whether a hostile work environment existed as to Billups, Foy, Napier, and Woods. Summary judgment is appropriate as to Yates.

**(B) whether plaintiff is entitled to punitive damages**

Defendant contends that summary judgment should be granted to it on the EEOC's punitive damages claim as it exercised good faith efforts to comply with Title VII.[11]

As stated above, defendant may avoid punitive damage liability by showing that it engaged in good faith efforts to comply with Title VII. To determine whether it has done so, this Court looks to whether defendant had a written anti-discrimination policy, and whether it

---

[11]     Defendant does not dispute that Vidic is a manager or that there existed malice or reckless indifference.

23

was effectively publicized and enforced.

### (1) written sexual harassment policy

Defendant has a sexual harassment policy contained in its Employee Handbook.

(Doc. 14 Ex. G) It provides as follows:

## HARASSMENT, INCLUDING SEXUAL HARASSMENT

Dave's ... is committed to a workplace free of discrimination and harassment based on ... sex...  Offensive or harassing behavior will not be tolerated against any employee. ... Supervisory or managerial personnel are responsible for taking proper action to end such behavior in their workplace.

In an effort to prevent sexual and other forms of harassment from occurring, this policy against harassment will be communicated to each employee.  No employee of this company is exempt from this policy.

Offensive conduct or harassment of sexual nature... may include but is not limited to:

- Offensive physical actions, written or spoken, and graphic communication (for example, obscene hand or finger gestures or sexually explicit drawings)

- Any type of physical contact when the action is unwelcome by recipient (for example, brushing up against someone in an offensive manner)

- Expectations, requests, demands, or pressure for sexual favors

- Slurs, jokes, posters, calendars, cartoons, and gestures that are offensive

Any such offensive conduct will be considered a prohibited form of harassment when any of the following are true:

- There is a promise or implied promise of preferential treatment or negative consequence regarding employment decisions or status

- Such conduct has the effect of creating an intimidating or hostile or offensive performance

- A third party is offended by the sexual conduct or communication

Harassment is considered a form of employee misconduct.  Disciplinary action, up to and including termination will be taken against any employee found engaging in this type of

24

behavior.  Any supervisor or manager who has knowledge of such behavior yet takes no action to end it is also subject to disciplinary action.

Anyone who believes he or she is being discriminated against as a result of harassing behavior is encouraged to report it immediately to your supervisor, store manager, Vice President of Operations [,] or one of the owners of the Company.

Under no circumstances need the employee report the harassment to a supervisor who is the person being accused of sexual harassment.  All complaints of harassment will be investigated promptly and impartially.  Reports of harassment and investigation of those reports will be kept confidential unless disclosure is required for investigation or by law.  The results of the investigation, and/or any action taken as a result of the investigation, will be communicated to the complaining party.

(*Id.*)

Clearly, defendant has a written anti-discrimination policy.  The issue is whether the policy was effectively publicized and enforced.

**(2) whether the policy was effectively publicized**

Defendant asserts that it publicizes its sexual harassment policy to its employees as evidenced by the following.

The policy states, "this policy against harassment will be communicated to each employee." Human Resources Manager Szylakowski, testified that all employees receive a copy of the Employee Handbook during their initial orientation, and that the store manager or the staffing coordinator conducts orientation, reviews the Employee Handbook with the employees, and all employees sign an acknowledgment that they received a copy of the Employee Handbook. (Szylakowski depo. at 44-45).

Additionally, Billups testified that on May 28, 2008, she received a copy of the Employee Handbook, and was aware of the sexual harassment policy. (Billups depo. 43-46). She signed an acknowledgment of her receipt of the handbook.  (Doc. 14 Ex. H)  Yates

25

testified that she knew Dave's had a sexual harassment policy in place, and that she signed

her acknowledgment of her receipt of the handbook. (Yates depo.24-25; Doc. 14 Ex. I). Foy

testified that she was aware that Dave's had a sexual harassment policy at the time Vidic

grabbed and exposed himself to her. (Foy depo. 30).  Woods testified that she received the

handbook but that she did not know whether it contained a policy concerning sexual

harassment.  She stated that she watched a video covering non-discrimination policies.

(Woods depo. 17-18) Napier testified that she received the handbook as part of an orientation

when she was first hired.  (Napier depo. 12)

Pointing to the following, plaintiff contends that defendant did not effectively

publicize its sexual harassment policy. Vidic testified that he never saw an Employee

Handbook or the sexual harassment policy. When asked what his understanding of sexual

harassment is, he responded, "I'm sorry, I don't know honestly.  What I know?"  (Vidic depo.

145-146; 84-85)  Albanese testified that he did not read the sexual harassment policy until

May 2009, and prior to that time nobody discussed it with him.  (Albanese depo. 35-36)

Seafood Manager Nichols testified that she was given the handbook and told to read it, but

she did not recall anyone discussing the policies and procedures with her. (Nichols depo. 20)

Beatrice Williams testified that the handbook and policies were "discussed at orientation,"

and that a trainer "briefly" went over it, "breezed over the information."  (Williams depo. 14-

15) Burt Saltzman testified that the handbook is given to employees when hired and they are

told to read it and ask questions if necessary.  (Saltzman depo. 16-17) Plaintiff asserts that this

attempt to publicize the sexual harassment policy by passing it out to employees and simply

relying on them to read and understand it is not a good faith effort.

Plaintiff contends that defendant's effort to publicize the policy was ineffective as evidenced by the following.  Billups testified that after she came out of the freezer when Vidic had touched her, Perry McCormick remarked, "He did something he wasn't supposed to do, didn't he?  I thought he would at least wait a week."  (Billups depo. 61) Denise Porter, the front end supervisor, testified that she "heard [Vidic] hits on girls in the store period." ((porter depo. 61) Managers and employees told Billups in June 2008 that Vidic had bothered others. Harmon shook his head and laughed when Vidic made an inappropriate comment to Billups on her first day of work. Billups also testified that Ray, whom she assumed to be the hot foods manager, told her that Vidic did not mean any harm and he "just needs a little something away from home."  (Billups depo. 72)

The Court does not find this testimony sufficient to show that defendant did not effectively publicize its sexual harassment policy.  The evidence shows that employees receive a copy of the Employee Handbook during their initial orientation conducted by a manager, and that the women making the allegations herein were aware of the handbook and the sexual harassment policy.

Plaintiff further contends that defendant fostered and tolerated an environment where the sexual harassment policy was meaningless.  Plaintiff points to seafood manager Nichols's testimony that when she reported Vidic's conduct, Albanese said, "Don't you know [Vidic and McDonough] are best friends?"  Nichols also testified that when she complained to a manager about Vidic possibly taking food without paying, Vidic called her an obscene name.

Nichols went to Albanese who told her to "Leave it alone.  Don't you know he's family?"[12]

(Nichols depo.28-38) Later, when Billups complained to Nichols about Vidic, Nichols

refused to get involved.  (*Id.* 44-45) Nichols also testified that the bakery manager told her

that Vidic "tried to approach her, too, and she thought it was funny," and that Vicky Wallace

(presumably another employee) told her that Vidic "tried to kiss her."  (*Id.* 48-49) Nichols

never had any training on sexual harassment.  (*Id.* 21)

The fact that Nichols had a conflict with Vidic over paying for his food and that

Albanese discouraged her from pursuing the matter does not show that defendant fostered and

tolerated an environment where the sexual harassment policy was meaningless.

**(3) whether the policy was effectively enforced**

Although defendant had a sexual harassment policy which it publicized, the Court

finds an issue of fact as to whether defendant effectively enforced the policy.

Defendant contends that it enforced its policy as evidenced by the fact that it

immediately investigated allegations which were reported to it.  Defendant points to the

investigations that were immediately conducted following the reports of Billups and Woods.

Defendant maintains that Foy did not report any harassment[13], and Napier did not sufficiently

---

[12]    Despite plaintiff's contention that Vidic had a close, personal relationship with
the Saltzmans, the testimony shows only that Vidic portrayed himself as being
friends with Saltzman.  Denise Porter testified that Vidic always said that he was
good friends with Burt Saltzman. (Porter depo. 54) Beatrice Williams testified
that Vidic would say that he is good friends with the Saltzmans.  (Williams depo.
45-46)

[13]    Defendant also contends that Yates did not report harassment.  The Court will not
address this contention as it agrees that summary judgment is warranted as to
Yates.

28

report sexual harassment.  For the following reasons, the Court finds that a jury could reasonably find that Foy and Napier reported sexual harassment.

Foy testified that she told the head cashier manager, Angie, that she quit because of Vidic's conduct.  Defendant points to Albanese's deposition testimony that when he questioned Angie, the head cashier, about Billups's allegation, she did not say whether there had been other allegations of the same nature against Vidic.  (Albanese depo. 61-62) There is at least an issue of fact as to whether Foy reported the harassment.

As to Napier, defendant points to her testimony that the first time she reported Vidic to Alabanese, she told Albanese "about [Vidic] pulling my tags, coming over there." Defendant asserts that this statement does not implicate sexual harassment.  (Doc. 14 at 33) The Court, however, has to construe any reasonable inferences in plaintiff's favor.  Napier testified that Vidic pulled on her apron strings from behind on a daily basis when he came through the deli area.  A reasonable inference can be made that Napier reported all the conduct to which she testified.

Defendant also acknowledges Napier's testimony that she reported Vidic's conduct to Farrar, her direct supervisor.  Defendant, however, points to Napier's testimony that she did not know whether Farrar ever talked to Vidic.  Nonetheless, Napier testified that Vidic continued to pull on her apron strings after she reported to Farrar. Whether or not Napier knew if Farrar ever talked to Vidic is not dispositive.

Finally, defendant contends that Napier did not report to Albanese that Vidic pulled her to him because she did not testify as to what she told Albanese but only that he was "shocked" when he heard it.  Again, the Court construes the evidence in plaintiff's favor and

29

a reasonable inference can be drawn that Napier told Albanese that Vidic pulled her to him

from behind based on Napier's testimony:

> A. ... I really told [Albanese] the second time which made me go look for another job is after the incident in the cooler when he pulled me close to him and groped me with my apron. I told him that day.
>
> Q. You told Sal [Albanese]?
>
> A. I told Sal that day.
>
> Q. You were in the --
>
> A. Deli cooler.
>
> Q. You were alone?
>
> A. Yes.
>
> Q. Did he close the door?
>
> A. No, the door was open. But it's like to where they bring our products, so it's not traffic back there.
>
> Q. And you went immediately after that to talk to Sal?
>
> A. Yes.
>
> Q. So tell me exactly what you told Sal. Did you tell him he had thrust his hips into you?
>
> A. He was acting like he was shocked and I was like, I can't take this. I can't work here like this. Is it in any way possible for you to keep him out of our department? He is like he can't do that.
>
> Q. He said he couldn't keep Jugo out of your department?
>
> A. He said I will talk to him and that was basically it.
>
> Q. Do you know whether Sal talked to him?
>
> A. No.

Q. Was that the second time?

A. Yes, that was the second time that I had talked to him.

Q. The first time he said keep it in your department?

A. Yes, he was like keep it in your department.

Q. The second time he said he couldn't keep Jugo out of your area?

A. Right.

(Napier depo. 36-37)

Because there is an issue of fact as to whether defendant failed to investigate the complaints of Foy and Napier, the Court cannot conclude that defendant effectively enforced its sexual harassment policy.[14]

Next, plaintiff contends that inadequate sexual harassment training shows that defendant did not effectively enforce its policy.  The Court agrees that there is an issue of fact. Szylakowski testified that defendant only provided sexual harassment training to its managers on May 28, 2009, partially in response Billups's EEOC charge.  Szylakowski did not know whether any informal training was ever provided prior to that date. (Szylakowski depo. 42-45, 80)  Store manager Albanese testified that he read the sexual harassment policy for the first time when the May 2009 training was given, and that was the first time the policy was discussed with him. Co-manager Booker Thomas also testified that he was not trained on

---

[14]    Plaintiff additionally maintains that the investigations into the complaints of Billups and Woods were incomplete, ineffective, or defective.  This Court disagrees.  The Court is not in a position to substitute its judgment for that of defendant in conducting its investigations, especially given that Szylakowski's report of Billups's allegation is not conclusory on its face and the investigation into Woods's allegation promptly resulted in Vidic's termination.

31

how to investigate a claim of sexual harassment.  (Thomas depo. 100) Vidic testified that he did not understand the training.  (Vidic depo. 88, 90) The Court agrees that there is at least an issue of fact as to whether defendant's managers were effectively trained in the sexual harassment policy.

For the foregoing reasons, there is an issue of fact as to whether defendant effectively enforced its sexual harassment policy based on the evidence that it did not investigate Foy's allegation and failed to adequately address Napier's allegations, and it did not provide sexual harassment training to its managers.  Therefore, summary judgment is not warranted on the issue of punitive damages.

**Conclusion**

For these reasons, defendant's Motion for Summary Judgment is denied except as to the claims relating to Yates. The issue of punitive damages will also go forward.

IT IS SO ORDERED.


          /s/Patricia A. Gaughan
          PATRICIA A. GAUGHAN
          United States District Judge
Date:  3/01/11

32